## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

NICHOL L. A., [1]

        **Plaintiff,**

v.

                                 **Case No. 21-CV-00480-SPM**

COMMISSIONER of SOCIAL
SECURITY,

        **Defendant.**

## MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) benefits pursuant to 42 U.S.C. § 423.

### PROCEDURAL HISTORY

Plaintiff applied for DIB in September 2016, alleging disability beginning on February 1, 2014. After holding an evidentiary hearing, an Administrative Law Judge (ALJ) denied the application on November 21, 2016, and again upon reconsideration on May 16, 2017. Plaintiff then filed a written request for a hearing on June 27, 2017 and testified at one on November 6, 2018. A different ALJ issued an unfavorable decision. (Doc. 13-2, p. 14.)

Subsequently, the Appeals Council issued a remand order, instructing yet

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

another ALJ to consider the entire set of medical evidence—including a consultative examination by Jacquelyn Francisco, Ph.D. that was not in the medical file previous ALJs had examined. (Doc. 13-2, p. 14, 39.) The Appeals Council also required the ALJ to conduct an additional evaluation of the Plaintiff's mental impairment under the special technique outlined in 20 CFR 404.1520a, and document his application of this technique. (*Id.* at p. 14).

Under these requirements, the new ALJ held a telephone hearing on November 23, 2020, in which the Plaintiff testified. (Doc. 13-2, p. 14.) The ALJ found that the Plaintiff was not disabled, and the Appeals Council denied review. The decision of the ALJ thus became the final agency decision, administrative remedies have been exhausted, and a timely complaint was filed in this Court (Doc. 1.)

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following points:

1.   The ALJ erred by failing to account for deficits of concentration, persistence, or pace in the assessment of Plaintiff's Residual Functional Capacity ("RFC").

2.   The ALJ erred by failing to identify and reconcile direct and obvious conflicts between the VE's testimony and the VE's cited source for job incidence data.

## APPLICABLE LEGAL STANDARDS

Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any step, other than at step three, precludes a finding of disability. *Id.* The plaintiff bears the burden of proof at steps one to four. *Id.* Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Id.*

This Court reviews the Commissioner's decision to ensure that it is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He found that Plaintiff worked after the alleged disability onset date, but determined that Plaintiff had not worked at the level of substantial gainful activity. The ALJ found that Plaintiff had severe impairments of "mild osteoarthritis, residuals of surgery on finger with nerve damage, obesity, post-traumatic stress disorder (PTSD), and generalized anxiety disorder (20 CFR 404.1520(c))." (Doc. 13-2, p. 17.)

Since Plaintiff has not challenged the ALJ's conclusions regarding her physical impairments, the Court will briefly address them here, before focusing on the mental health-related impairments. The ALJ concluded that Plaintiff's physical impairments—either in isolation or combination—were insufficiently severe. (Doc. 13-2, p. 18.) Thus, he determined that Plaintiff has the RFC to "occasionally climb stairs and ramps, . . . balance, stoop, kneel, crouch, and crawl," as well as "frequently handle and finger with the upper extremities." However, Plaintiff is limited to "light

work" and "cannot climb ladders, ropes, or scaffolds." (*Id.* at p. 20.)

The ALJ also concluded that the Plaintiff's mental impairments were not severe enough to preclude her from some types of work: "Although the claimant has long-standing psychiatric symptoms resulting from childhood trauma, nonetheless, evidence shows she has the ability to obtain, maintain, and perform jobs in spite of her history of long-standing mental health impairments." (Doc. 13-2, p. 24.) The ALJ cited her work history (full-time from 2005 to 2014 and part-time from 2015-2016); ability to seek treatment; frequency of treatment (and lack thereof); and various medical professionals' opinions in support of this determination. (*Id.* at p. 24-26.) Thus, the ALJ found that Plaintiff "is limited to work involving simple, routine tasks and simple work-related decisions." She can also "perform work that involves occasional interaction with the public and coworkers," but not "fast-paced work such as work on an assembly line." (*Id.* at p. 20.)

The ALJ also relied on the testimony of a vocational expert (VE). While Plaintiff is unable to perform her past relevant work as a nurse assistant, the VE identified three jobs from the Dictionary of Titles (DOT) that Plaintiff could perform: mail clerk, checker I, and classifier. The VE also testified that 102,000, 69,000, and 187,000 jobs exist in the national economy for these positions, respectively. The ALJ adopted the VE's findings and ruled that Plaintiff was not disabled and thus did not qualify for benefits. (Doc. 13-2, p. 27-28.)

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.

I.     **Agency Forms**

Plaintiff was born in 1974 and was 39 years old on the alleged onset date.  (Doc. 13-3, p. 2.) She has at least a high school education and she last worked on March 10, 2016. (*Id.* at p. 6.) She alleged in her initial claim on August 12, 2016 that she had PTSD, uncontrolled hypertension, high anxiety, nerve damage, headaches, and dysfunctional uterine bleeding. (*Id.* at p. 2-3.) During an October 2016 phone call to obtain her Activities of Daily Living (ADLs), she also claimed that she "has difficulty with concentration," "can pay attention for 15-20min and then gets frustrated," "has difficulty with getting along with authority figures," "handles stress poorly," and "has difficulty handling changes." (*Id.* at p. 5.) However, she can use the stove, sort laundry, do "simple chores," shop twice a month, handle her own finances, use a cell phone, and use a computer as needed. (*Id.*) She also reads and watches television, although she rests during the day and "falls asleep sometimes and forgets what she was doing when she wakes up." (*Id.*)

II.    **Evidentiary Hearing**

Plaintiff expanded on how her mental health limitations affect her. She described being "very nervous, paranoid," having difficulty sleeping, and "really struggling with the anxiety and the paranoia" frequently. (Doc. 13-2, p. 49, 51.) When she goes to the grocery store, she has "to make [her]self believe that when [she leaves] the house that nothing bad is going to happen." (*Id.* at p. 51.) Indeed, she noted that she can "function okay at home" and "feel[s] safe, safer at home," despite some "slight anxiety attack[s]." Plaintiff also described how her symptoms are often fact-specific and not generalizable. For example, she noted that her problems are "different every

time . . . depend[ing] on the energy and the crowd" around her. (*Id.* at p. 53.)

A VE also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment (Doc. 13-2, p. 20, 62.). The VE testified that this person could work as a mail clerk, checker I, and classifier. She also testified that there were 102,000, 69,000, and 187,000 jobs available in the national economy for these three positions, respectively. The ALJ asked the VE what she based her opinions about "off task behavior, absences, fast-paced work, anything else not addressed by the DOT on." The VE responded that it was based on her "professional experience and opinion." She also testified that the source of her job numbers was the Department of Labor. Finally, the VE noted in response to the ALJ's questions that the individual would not be able to "maintain employment without a special accommodation" if he or she was "off task at least 15% of the workday" or had to miss work at least twice a month. (*Id.* at p. 62-63.)

## III.   Medical Records

Plaintiff saw Cynthia Riewski, an LCSW under Dr. Ouedraogo Basga Bernard, on June 27, 2016. She reported anhedonia, racing thoughts, irritableness, agitation, anxiousness, worrying, a history of panic attacks, and numerous symptoms of PTSD. (Doc. 13-7, p. 375.) She also noted that she felt "little interest or pleasure, fatigue, and feeling like she's let her family down." (*Id.*) Among the "life stressors" she mentioned were "the recent murder of her step-grandson, the loss of her brother, daughter with severe disabilities in nursing home, [and] caring for her 2 nephews." (*Id.*)

On her July 18, 2016 visit with Ms. Riewski, Plaintiff reported numerous

symptoms of depression, PTSD, and panic. (Doc. 13-7, pp. 372-73.) She also recounted that she had two panic attacks—one when her blood pressure spiked and she could not get medication, and another time when she lost her dog in a storm. (*Id.*) Additionally, Plaintiff discussed her worries about various physical health conditions, including a future surgery and a fear of having cancer. (*Id.*) Finally, she spoke "about her mother prostituting her at age 12 for drugs and how she's forgiven her, but gets upset when she talks to her mother." (*Id.*)

On July 22, 2016, Plaintiff saw Dr. Gopinath Gorthy for an initial evaluation after a referral. (Doc. 13-7, pp. 377-79.) Plaintiff "reported that she was sexually abused as a child and sexually assaulted at the age of 14 years, [and] shortly after she was diagnosed with PTSD and received psychotherapy twice/week for two years. (*Id.*) She also reported seeing a psychiatrist in New York, for PTSD symptoms and was prescribed Zoloft. (*Id.*) Her symptoms eventually remitted and [she] eventually stopped seeing [her] psychiatrist after 5 years of treatment." (*Id.*) However, Plaintiff said that she had recently "started hav[ing] panic attacks and was prescribed Alprazolam." (*Id.*) She also stated that she has been "feeling sad about many of her family members dying because of cancer." (*Id.*)

The Mental Status Exam (MSE) also revealed no abnormalities in appearance, behavior, speech, perception, cognition, intelligence, thought process, thought content, or motor activity. (Doc. 13-7, p. 379.) Still, Plaintiff's insight and judgment were deemed "fair," her mood "euthymic," and her affect "congruent to thought content." (*Id.*)

The MSE from Plaintiff's subsequent visit with Riewski on August 11, 2016

was similar. This time, however, Riewski noted that Plaintiff's behavior was "agitated," her mood "irritable," and her affect "anxious and tearful and congruent to thought content." (Doc. 13-7, p. 215.) Finally, on August 12, 2016, Plaintiff was "[r]efusing to go back to see the psychiatrist. (*Id.* at 209.) The MSE noted that Plaintiff was "anxious and agitated." (*Id.* at 212.)

On April 27, 2017, Jacquelyn Francisco, Ph.D. saw Plaintiff for a psychological consultative examination. (Doc. 13-8., p. 168.) Dr. Francisco found that Plaintiff had no impairment in understanding, remembering, or applying information; moderate impairment in adapting and managing herself; and moderate-to-severe impairments in interaction with others and concentration, persistence, and pace. (*Id.* at 170.) Dr. Francisco remarked that:

> While [Plaintiff] has the abilities to engage with others appropriately and seems to have a pleasant disposition that would allow her to relate well with supervisors and co-workers, she is considerably hypervigilant. Her mental health concerns would impact her ability to engage in a productive way. Furthermore, her mental health concerns impact her desire to engage with others or leave her house, as she fears for her safety and has paranoid thoughts. This would likely limit others' abilities to connect with her.
> . . . .
> [Plaintiff] answered questions appropriately and demonstrated good persistence. However, her pace was quick, and her frequent intrusive thoughts and paranoid thoughts would significantly impact her ability to be efficient and remain focused or on-target. Furthermore, her mental health significantly impacts her ability to sustain attention and mental clarity. (*Id.*)

Thus, Dr. Francisco found that Plaintiff "endorsed symptoms consistent with PTSD, anxiety, and depression," although the severe PTSD diagnosis was provided because her anxiety and depression "are highly related to her

unresolved chronic and complex PTSD." (*Id.*)

Since January 2018, Plaintiff has also seen M. Javed Qasim, M.D. "for anxiety which has physical side effects," including high blood pressure and heart rate. (Doc. 13-8, p. 174.) In a February 2020 letter, Dr. Qasim noted that Plaintiff "is being treated but mental illness is highly unpredictable but manageable in most situations and through avoiding anxiety producing situations." (*Id.*) He then described the symptoms of Generalized Anxiety Disorder according to DSM 5.[2] (*Id.*)

In June 2018, Plaintiff had an appointment at St. Louis Behavioral Health Services (STLBH). (Doc. 13-7, p. 446.) She reported up-and-down energy, concentration, appetite, sleep, and mood. (*Id.*) She also mentioned that she "found her father dead in [a] chair at his home when she was told to go check on him by her mother" and had been "taking her father's death hard." (*Id.*) A mental examination found that her mood was "anxious," but did not include any other noteworthy comments. (*Id.*) At her November 2018 STLBH visit, she mentioned that her mood had improved, but she was "anxious and stressed" about her sister's incarceration for attempted murder and had variable energy, concentration, appetite, and sleep. The examination once again found her mood "anxious." (Doc. 13-8, p. 235.) Notes from her March 2019 visit included Plaintiff recalling feelings of depression from her son's deployment to Afghanistan and high blood pressure due to anxiety. Her overall mood, energy, concentration,

---

[2] For discussion on Dr. Qasim's findings, including a quotation of his summary of DSM 5, *see infra* p. 26-28.

appetite, and sleep were "up and down," and the examination once again revealed an "anxious" mood. (*Id.* at. p. 241.)

Finally, at a June 2020 visit with Riaz A. Naseer, M.D. for back pain, Plaintiff reported "worsening problems with [a] family member which causes more anxiety" and the death of a relative in New York due to COVID-19. (Doc. 13-8, p. 191.)

## IV.  State Agency RFC Assessments

In October 2016, Donald Henson, Ph.D. reviewed the evidence of record available at the time. (Doc. 13-3, p. 12.) He opined that Plaintiff had moderate limitations in her ability to "carry out detailed instructions"; "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; and "interact appropriately with the general public." (*Id.*) Overall, Dr. Henson concluded that Plaintiff was "[c]apable of one/two step activities." (*Id.* at p. 13.)

In May 2017, Howard Tin, Psy.D. assessed Plaintiff's RFC based on a review of the file materials. (Doc. 13-3, p. 29.) He found that Plaintiff has moderate limitations in her ability to "carry out detailed instructions," "maintain attention and concentration for extended periods," "work in coordination with or in proximity to others without being distracted by them," and "interact appropriately with the general public." (*Id.* at p. 29-30.) He also summarized and explained his findings as follows:

Mood was anxious and depressed and affect was appropriate to mood during the examination. [Plaintiff] has difficulty carrying out detailed instructions and maintaining attention and concentration for extended periods of time, however the person is capable of performing simple tasks. [Plaintiff] has difficulty in interacting appropriately with the general public and tend [*sic*] to harbor paranoid ideation, so limit [her to] work tasks that do not require interaction with the general public. [Plaintiff] has the ability to respond appropriately to changes in work settings, being aware of normal hazards and travel in unfamiliar settings.

Claimant is capable of performing one and two-step tasks.
. . .
[Plaintiff's] allegation of the severity of the disorder is not consistent with [her] ability to function generally well from day to day.

(*Id.* at p. 31.)

ANALYSIS

## I.   Plaintiff's Deficits of Concentration, Persistence, or Pace

Plaintiff's argument regarding concentration, persistence, or pace is two-fold. First, Plaintiff challenged the RFC because it contained "problematic phrases" that the Seventh Circuit has ruled are inadequate reflections of individuals with moderate limitations in concentration, persistence, or pace. (Doc. 15, p. 16.) Second, Plaintiff asserted that the ALJ failed to "reach consistent findings relying on evidence in the record." (*Id.* at p. 17.)

Plaintiff's argument that the RFC was improper because of its inclusion of "problematic phrases" is unpersuasive. The Commissioner rightly noted the "fact specific nature of" the cases that Plaintiff cited. (Doc. 20, p. 9.) For example, the Seventh Circuit has considered whether an "ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). Note that

the Seventh Circuit specifically focused on "the claimant's limitations," as opposed to a generic person with moderate limitations in concentration, persistence and pace. More recently, the Seventh Circuit considered "what kinds of work restrictions might address [claimant's] limitations in concentration, persistence, or pace." *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019). Once again, the Seventh Circuit considered the limitations of the claimant specifically, as opposed to someone in general with moderate limitations in concentration, persistence, and pace.

Thus, Plaintiff's argument about the RFC containing some phrases that the Seventh Circuit has deemed insufficient is unpersuasive. What matters is whether those phrases sufficiently characterize Plaintiff's limitations, not whether those phrases adequately described plaintiffs' limitations in other cases. The Court now turns to the former consideration, highlighting erroneous aspects of the ALJ's ruling that show the incongruity between the RFC and Plaintiff's actual limitations.

### a. Medical Opinions Suggesting Limitations Beyond the ALJ's Conclusions Prevent Automatic Dismissal

The Commissioner has argued that "[n]o medical source found greater work-related mental limitations than assessed by the ALJ. For that reason alone, the ALJ's decision must stand." (Doc. 20, p. 11.) However, this assertion is inconsistent with the record—as contained within the ALJ's decision itself. For example, the decision notes that Dr. Francisco found that Plaintiff "had a moderate-to-severe impairment in interaction with others and concentration, persistence or maintaining pace." (Doc. 13-2, p. 25.) It is true that the ALJ gave "this assessment partial weight." Yet Dr. Francisco's opinion directly contradicts any assertion that "no doctor's opinion . . .

indicated greater limitations than" the ALJ's finding of "moderate limitations" in concentration, persistence, or pace. *Best v. Berryhill*, 730 Fed. Appx. 380, 382 (7th Cir. 2018) (quoting *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)); (Doc. 13-2, p. 19.)

Moreover, Dr. Tin—whose findings the ALJ afforded "significant weight"—also raised a greater limitation than the ALJ found. (Doc. 13-2, p. 26.) As the ALJ noted, Dr. Tin assessed that Plaintiff "would be limited to work tasks that do not require interaction with the general public." (*Id.*) Nonetheless, the ALJ concluded that Plaintiff "can perform work that involves occasional interaction with the public." (*Id.* at p. 20.) Thus, Dr. Tin's tighter limitation on Plaintiff's interactions with the public prevent a ruling for the Commissioner solely under *Best*.

### b. The ALJ's Contradiction of Dr. Tin Casts Significant Doubt on the ALJ's Decision

The ALJ's imposition of more relaxed restrictions than Dr. Tin opined raises serious questions about the ALJ's decision. After all, "an internally inconsistent opinion by an ALJ is likely to fail to build a logical bridge between the evidence and the result." *Lothridge v. Saul*, 984 F.3d 1227, 1234 (7th Cir. 2021). Here, a clear internal inconsistency exists. The ALJ said he gave Dr. Tin's findings "significant weight," Dr. Tin concluded that Plaintiff was "limit[ed to] work tasks that do not require interaction with the general public," yet the ALJ still determined that Plaintiff "can perform work that involves occasional interaction with the public."[3] (Doc. 13-2, p. 20, 26; Doc. 13-3, p. 31.)

---

[3] This inconsistency is further highlighted by the Commissioner's contention that the ALJ "adopted the state agency psychologists' opinions in full," referring to the opinions of Drs. Henson and Tin. (Doc.

Notably, the ALJ never addressed or even acknowledged this inconsistency in his decision. The Seventh Circuit has highlighted the importance for ALJs to confront an opposing opinion and explain why they reject them. *See Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012). The ALJ's failure to do so as it pertains to Dr. Tin's opinion shows that he did not "build a logical bridge from evidence to conclusion," as the Seventh Circuit requires. *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009) (per curiam).

### c. The ALJ Mischaracterized Dr. Francisco's Reliance on Plaintiff's Subjective Complaints

In explaining why he gave Dr. Francisco's "moderate-to-severe impairment" determination only "partial weight," the ALJ stated that it "appeared to be based on the [Plaintiff's] severe self-reported difficulties, which the record has shown are not supported." (Doc. 13-2, p. 25.) Yet the ALJ's determination that Dr. Francisco's conclusions were solely based on Plaintiff's subjective accounts is inconsistent with Dr. Francisco's evaluation. Her conclusions as to Plaintiff's concentration, persistence, and pace read as follows:

> Moderate-to-Severe impairment. [Plaintiff] answered questions appropriately and demonstrated good persistence. However, her pace was quick, and her frequent intrusive thoughts and paranoid thoughts would significantly impact her ability to be efficient and remain focused or on-target. Furthermore, her mental health significantly impacts her ability to sustain attention and mental clarity. (Doc. 13-8, p. 170.)

It is difficult to conclude from this quotation that Dr. Francisco relied solely on Plaintiff's subjective accounts. For one thing, the appropriateness of

---

20, p. 11.)

Plaintiff's responses, her persistence, and her pace are all objective determinations by Dr. Francisco. "[A]ttention and mental clarity" also seem to be characteristics that a trained medical professional could discern from a sixty-minute evaluation. Notably, nowhere in the above-quoted paragraph did Dr. Francisco say "[Plaintiff] reported" or anything indicating else that these conclusions were not supported by her medical expertise.

This analysis of Dr. Francisco's opinion is important because, as the Commissioner noted, the Seventh Circuit has held that "where a treating physician's opinion is based on the claimant's subjective complaints, the ALJ may discount it." *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th. Cir. 2013) (citing *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008)). Notably, however, both *Bates* and *Ketelboeter* involved analyses of the plaintiffs' physical limitations. In *Ketelboeter*, for example, the Seventh Circuit noted that "repeated x-rays showed no physical changes that might have corroborated the claimed increase in pain that Ketelboeter reported over time." 550 F.3d at 625 (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).

Thus, the Commissioner's extension here of the subjective-versus-objective case law from physical to mental limitations requires caution. While it may be easy to compare a plaintiff's claims of pain against an x-ray, such a comparison is much more difficult when it comes to mental health. An x-ray cannot evaluate whether Plaintiff has "frequent intrusive thoughts and paranoid thoughts." (Doc. 13-8, p. 170.) Dr. Francisco is in a superior position to the ALJ when it comes to evaluating Plaintiff's mental limitations.

In short, the ALJ's decision to give only "partial weight" to Dr. Francisco's opinion because of its ostensible reliance on "self-reported difficulties" is inconsistent with Dr. Francisco's actual report, and the unique nature of mental health conditions. (Doc. 13-2, p. 25.)

### d. The ALJ Made Improper Inferences from Aspects of the Record

The ALJ's assessment that Dr. Francisco's "moderate-to-severe impairment" determination deserved only "partial weight" also relied on his conclusion that Plaintiff's "severe self-reported difficulties . . . are not supported" by the record. (Doc. 13-2, p. 25.) In other words, the ALJ challenged Plaintiff's credibility.

The Seventh Circuit has held that "[c]redibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (quoting *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)). However, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (quoting *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994)).

Here, the ALJ never pointed to anything from the hearing that justified his questioning of Plaintiff's credibility. Instead, he focused on other aspects of the record. As a result, this Court has more flexibility to assess the ALJ's citations of the record. In fact, the Seventh Circuit has established that "disturb[ing] an ALJ's credibility determination" may be appropriate when the "finding is unreasonable or unsupported." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (citing *Sims*, 442

F.3d at 538).

### i. The ALJ Overanalyzed Plaintiff's Prior Work History

The first aspect of the record that the ALJ cited to undermine Plaintiff's accounts is her work history. Plaintiff worked between 2005 and 2014 as a certified nurse assistant, before performing part-time work in 2015 and 2016 as a home health aide. The ALJ concluded that Plaintiff's "performance of this work . . . shows she is, and has been, able to set aside her traumatic past and meet the current demands of competitive work." He further noted that her employment "for many years in spite of her underlying mental impairments . . . indicates that the present treatment modalities are effective in addressing her intermittent symptomology such that she is returned to baseline status." (Doc. 13-2, p. 24.)

That the ALJ considered her prior work is not in and of itself improper. As the Commissioner notes, the Social Security Administration (SSA) has established that "prior work record" and "efforts to work" are relevant factors for ALJs to consider. SSR 16-3p, 2016 WL 1119029, at *6 (Mar. 16, 2016). Yet courts cannot blindly accept work history as dispositive proof that an individual's disability is less prohibitive than he or she claims: the SSA's own guidance includes numerous other factors to consider, including "change over a period of time (e.g., whether worsening, improving, or static)." *Id.* at *7.

Here, the ALJ's conclusions that Plaintiff's work history demonstrates that "she is . . . able to set aside her traumatic past" are unreasonable and appear to evince a lack of understanding about the effects of mental health conditions. (Doc. 13-2, p. 24.) It is true that Plaintiff's psychological symptoms stem from horrific childhood

trauma. However, the fact that Plaintiff worked full-time between 2005 and 2014 does not establish that she had permanently learned to cope with her trauma after 2014. Such a conclusion rests on the assumption that at some point after the root cause, symptoms of PTSD, depression, and anxiety must plateau, if not decrease.

Moreover, there is evidence that Plaintiff's mental health conditions worsened towards the end of her working tenure and afterwards. For example, Plaintiff noted at the hearing that her anxiety and paranoia "did get worse after I did my job" at Memorial Hospital between 2011 and 2014. (Doc. 13-2, p. 50.) In response to the ALJ's question about why she felt that she couldn't work, Plaintiff said that she "get[s] very nervous, paranoid," citing as an example when she "caught something from a patient one time and they didn't even tell me and they knew and didn't tell me until later." (Doc. 13-2, p. 49.)

That Plaintiff's mental health was worse after versus during her work is also supported by Plaintiff's medical record—specifically, notes from her July 22, 2016 appointment with Dr. Bernard. Plaintiff reported that she recently started having panic attacks, for which Dr. Bernard prescribed Alprazolam. She also "report[ed] feeling sad about many of her family members dying because of cancer." (Doc. 13-3, p. 6.)

In analyzing work histories, the Seventh Circuit has considered whether the reason a claimant left his or her position is related to the alleged disability. In *Donahue v. Barnhart*, the Seventh Circuit found it significant that Plaintiff "was fired for refusing to participate in counseling, a reason unrelated to back pain." 279 F.3d 441, 444 (7th Cir. 2002). Here, however, the ALJ never considered whether Plaintiff's

lack of full-time employment since 2014 is related to PTSD, anxiety, or depression. This omission occurred despite Plaintiff explicitly telling the ALJ that her mental health worsened during her work between 2011 and 2014. (Doc. 13-2, p. 50.) On remand, the SSA must consider the reasons that Plaintiff stopped working full-time in 2014. After all, if she stopped working at Memorial Health because her disability prevented her from doing so, her tenure there can hardly be used as evidence of her ability "to set aside her traumatic past and meet the current demands of competitive work." (Doc. 13-2, p. 24.)

Additionally, the SSA should consider the similarities and differences between Plaintiff's mental impairments while working and after working. Such considerations would not only be consistent with *Donahue*, but also align with the SSA's own guidance that "change over a period of time (e.g., whether worsening, improving, or static)" is "[i]mportant information about symptoms." 279 F.3d at 444; SSR 16-3p, 2016 WL 1119029, at *6. The underlying rationale for such consideration is clear: Plaintiff's work history can only serve as evidence of coping with childhood trauma if her subsequent mental state was similar or better than that when she was working.

To be fair, the ALJ did note how Plaintiff pointed to "other, or more recent, incidents" as affecting her mental health. However, in justifying his citation of Plaintiff's work history, concluded the following:

> Although these factors may contribute to her anxiety or cause situational apprehension or anxiety, nonetheless, the record of evidence does not support disabling limitations from these symptoms and factors." (Doc. 13-2, p. 24.)

It is unclear what exactly composes "the record of evidence" that the ALJ

referred to. The closest explanation might come from the subsequent paragraph, which mentions how "the record shows acute treatment or increases in medication for things such as the death of a family member, anxiety over surgery or long-distance travel, her son being deployed to Afghanistan, her sister being jailed for attempted murder, and the loss of her dog." The ALJ used this as evidence that Plaintiff "receives prompt therapeutic intervention, as well as the requested psychotropic medication." Thus, in conjunction with her work history, the ALJ concluded that Plaintiff's "present treatment modalities are effective in addressing her intermittent symptomology such that she is returned to baseline status." (Doc. 13-2, p. 24.)

To put it charitably, this analysis is highly unpersuasive when one reads the medical records that the ALJ cited. Exhibits 5F/1 and 6F/15 pertain to a "[l]aparoscopic-assisted vaginal hysterectomy and bilateral salpingectomy" and "right flank/back pain," respectively. (Doc. 13-7, p. 286-288, 316.) Neither of these records relate to Plaintiff's mental health. The other six medical records range from June 2016 to June 2020 (Doc. 13-7, p. 371-376, 446-447; Doc. 13-8, p. 191-196, 235-236, 241-242.) Thus, none of them reflect Plaintiff's mental health while she was working—either full-time or part-time.[4]

Furthermore, medical providers' notes from these appointments actually support the assertion that Plaintiff's mental health has gotten worse since she ceased working. Notes from June 2016 reflect "a number of life stressors …

---

[4] Plaintiff's last date worked was March 10, 2016 (Doc. 13-3, p. 6.)

including coping with the recent murder of her step-grandson, the loss of her brother, daughter with severe disabilities in nursing home, caring for her 2 nephews, and other stressors." (Doc. 13-7, p. 375.) Plaintiff reported in June 2018 that "she found her father dead in [a] chair at his home when she was told to go check on him by her mother" and "is taking her father's death hard." (Doc. 13-7, p. 446.) In March 2019, Plaintiff reported feeling depressed because her son was deployed to Afghanistan. (Doc. 13-8, p. 241.) In June 2020, Plaintiff complained of "worsening problems with [a] family member which causes more anxiety" and that she had "lost a family member in NY to CoVid." (Doc. 13-8, p. 191.)

The ALJ's citation of these records to contest Plaintiff's claims of disability are unreasonable. If anything, they buttress Plaintiff's claims by showing the specific and significant stressors that she faced. While the ALJ argued that these medical appointments showed that Plaintiff could return to "baseline status" with treatment, an analysis of the records more reasonably suggests that her mental health conditions had worsened so significantly that she had to seek treatment. (Doc. 13-2, p. 24.)

Indeed, the ALJ's decision tries to have it both ways when it comes to Plaintiff's treatment. As discussed above, he points to Plaintiff's medical records as evidence that treatment is sufficient to return her to "baseline status." (Doc. 13-2, p. 24.) Yet immediately afterwards, he points to Plaintiff's lack of medical treatment as evidence that her real limitations are not "commensurate with the alleged severity" (*Id*. at p. 25.) In other words, the ALJ is pointing to both her

treatment and lack of treatment as evidence against a finding of disability.

### ii. The ALJ Improperly Emphasized Plaintiff's Lack of Treatment

The Court now turns to the ALJ's analysis of Plaintiff's treatment history. The ALJ asserted that "[t]he disabling mental health limitations she professes or claims are not met in kind with a commensurate level of treatment one would reasonably expect given the alleged nature and chronicity of her symptoms." (Doc. 13-2, p. 25.) In reaching this conclusion, however, the ALJ did not consider why Plaintiff avoided medical treatment—despite several reasonable explanations in the record.

The Commissioner has defended the ALJ's consideration of Plaintiff's medical treatment as a "relevant consideration" by citing the SSA's prior ruling that "if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints . . . we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." SSR 16-3p, 2017 WL 5180304, at *9 (Oct. 25, 2017). (Doc. 20, p. 8.) The very next sentence of the SSA's ruling, however, states that it would "not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." SSR 16-3p, 2017 WL 5180304, at *9.

But that is exactly what the ALJ did in this case. He failed to consider why Plaintiff might not have sought more treatment, despite the record providing several reasons. For example, on August 12, 2016, Plaintiff had a

follow-up appointment at Anderson Hospital. She was unwilling "to go back to see the psychiatrist," despite the Mental Status Exam (MSE) noting that she "was anxious and agitated." (Doc. 13-3, p. 6.) This instance suggests that Plaintiff's decisions about whether to seek treatment are not perfect indicators of her underlying conditions.

Plaintiff's testimony before the ALJ also provided potential explanations for why she has not sought more regular mental health treatment. She noted that she has a psychiatrist who assists her, but Plaintiff is unable to see her and can only talk to her on the phone every three months. (Doc. 13-2, p. 51.) Although she did not elaborate, this testimony indicates that Plaintiff may have barriers to receiving treatment that are unrelated to the severity of her conditions. She also pointed to the COVID-19 pandemic as a barrier to seeing a therapist, and said—albeit with respect to her physical conditions—that she "was too paranoid to go to the hospital because of COVID." (*Id.* at p. 52, 56.) Indeed, on one occasion, doctors told her to go to the emergency room, yet she refused to do so, explaining that she does not "trust those [Anderson Hospital] emergency room doctors" and does not like the doctors at St. Louis University. In fact, she does not "like any of the hospitals around here at all" because she has "had experience with a lot that they don't have good bedside manners or anything." (*Id.* at p. 55-56.)

If Plaintiff was ordered to go to the emergency room due to the severity of a medical condition yet refused because of her distrust of the doctors, clearly her decisions about whether to seek treatment are not solely based on the

seriousness of her conditions. A distrust of and prior bad experiences with doctors are understandable reasons for Plaintiff to not "comply with treatment or seek treatment consistent with the degree of his or her complaints." SSR 16-3p, 2017 WL 5180304, at \*9. Nonetheless, the ALJ never considered it.

On remand, the SSA should follow its own ruling and determine why Plaintiff did not seek further mental health treatment. Such an evaluation is especially important in the context of mental health conditions because individuals may avoid receiving treatment for myriad reasons. As just one statistic, the National Institute of Mental Health found that only 64.5% of individuals with serious mental illness sought any form of treatment in 2020.[5] While it is not the Court's role to determine why Plaintiff did not seek further treatment, the SSA has promulgated rules that require it to do so.

### e.  The ALJ Improperly Discounted the Opinion of Dr. M. Javed Qasim

The ALJ also inappropriately diminished the conclusions of Dr. M. Javed Qasim, who wrote in a February 2020 letter that he had been treating her "for anxiety which has physical side effects" since January 2018. Specifically, the ALJ argued that Dr. Qasim's quotation of DSM 5 guidelines regarding General Anxiety Disorder should be "given little weight" because it is a "generalized quote" and there is not any "indication that this quoted material applies to the [Plaintiff] in total or only partially." (Doc. 13-2, p. 26.) On its face, this argument is unreasonable. If Dr. Qasim included the quotation in a letter about his treatment of Plaintiff, there exists a

---

[5]   *See* Mental Illness, National Institute of Mental Health, https://www.nimh.nih.gov/health/statistics/mental-illness (last visited on Aug. 3, 2022).

strong implication that the quotation applies to her. Why include it otherwise?

The ALJ's weighing of Dr. Qasim's letter is further undermined by Seventh Circuit precedent that generally requires strong weighing of a treating physician's conclusions. "A treating doctor's opinion receives controlling weight if it is 'well-supported' and 'not inconsistent with the other substantial evidence' in the record." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (citations omitted). An "ALJ must also 'offer good reasons for discounting' the opinion of a treating physician." *Charmaine R. v. Saul*, 2021 WL 83737, *3 (N.D. Ill. 2021) (citations omitted). Specifically, the ALJ must "consider a variety of factors, including: (1) the length, nature, and extent of the treatment relationship; (2) the frequency of examination; (3) the physician's specialty; (4) the types of tests performed; and (5) the consistency and support for the physician's opinion." *Id.* (citing 20 C.F.R. § 404.1527(c)).

The ALJ did not meet these requirements. While he did mention that Dr. Qasim's statement was inconsistent with "the generally normal mental status examinations in her more recent treatment records," nowhere did he address requirements (1) to (4). If the SSA chooses to adopt a final opinion discounting Dr. Qasim's testimony on remand, it must ensure that all five requirements pertaining to a treating physician's opinion are met. It should also be cognizant of the Seventh Circuit's ruling that "[a] contradictory opinion of a non-examining physician does not, by itself, suffice as a justification for discounting the opinion of the treating physician." *Israel v. Colvin*, 840 F.3d 432, 437 (7th Cir. 2016) (citing *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

Furthermore, the ALJ unreasonably discounted Dr. Qasim's letter for failing

to "provide the maximum level of mental health functioning for work activities that [Plaintiff] could sustain." (Doc. 13-2, p. 26.) However, the quotation the ALJ ignored mentioned that "[t]he anxiety, worry, or physical symptoms cause clinically significant impairment in social, occupational, and other important areas of functioning." It also mentioned "often … feeling keyed up or on edge, difficulty concentrating, mind going blank, muscle tension, and social anxiety." (Doc. 13-8, p. 174.)

Admittedly, these limitations are not as specific as the functional limitations that Dr. Tin provided. Yet it would be unreasonable to expect Dr. Qasim to provide such detailed functional limitations since it is not his job to do so. The ALJ's reasons for discounting Dr. Qasim's findings, despite his regular treatment of Plaintiff for over two years, are insufficiently explained at best, and unreasonable at worst. Finally, it is worth highlighting the overdemanding nature of the ALJ and Commissioner's desires for Drs. Qasim and Francisco to state work conditions under which Plaintiff could function. (Doc. 13-2, p. 26; Doc. 20, p. 8.) Given their general opinions that Plaintiff has significant limitations to functioning in any work environment, requiring them to opine on limitations under which Plaintiff can work seems somewhat incongruous.

### f.  Dr. Francisco Did Include Functional Limitations

The deficiencies in the Commissioner's undermining of Dr. Francisco's opinion do not end there. The Commissioner diminished her opinion because she "did not provide functional limitations to accompany" it, thus "not conflict[ing] with that of the state agency psychologists," Drs. Henson and Tin. (Doc. 20, p. 8.) Yet this

assertion mischaracterizes Dr. Francisco's opinion. The opinion includes numerous conclusions directly relating to Plaintiff's ability to work:

- "Her mental health concerns would impact her ability to engage in a productive way." (Doc. 13-8, p. 170.)

- "[H]er mental health concerns impact her desire to engage with others or leave her house, as she fears for her safety and has paranoid thoughts. This would likely limit others' abilities to connect with her." (Doc. 13-8, p. 170.)

- "[H]er frequent intrusive thoughts and paranoid thoughts would significantly impact her ability to be efficient and remain focused or on-target." (*Id.*)

- "Furthermore, her mental health significantly impacts her ability to sustain attention and mental clarity." (*Id.*)

- "[Plaintiff] is able to regulate her emotions when alone in a predictable, safe, and non-changing environment." (*Id.*)

These quotations illustrate that Drs. Henson and Tin were not the only medical professionals who provided some form of functional limitations. Indeed, the last quotation about Plaintiff needing a "predictable, safe, and non-changing environment" contradicts Dr. Tin's conclusion that she "has the ability to respond appropriately to changes in work settings." (Doc. 13-3, p. 31.) Notably, the ALJ never addressed these functional limitations, despite addressing those from Dr. Tin. This omission is inconsistent with the Seventh Circuit's ruling that an "ALJ may not select and discuss only the evidence that supports his conclusion; instead the ALJ's analysis should show that he or she considered all the important evidence." *Gibson v. Massanari*, 18 Fed. Appx. 420, 425 (7th Cir. 2001) (citing *Zurawski*, 245 F.3d at 888).

The lacking discussion of Dr. Francisco's functional limitations is understandable here, given that the ALJ only assigned her opinions partial weight and thus may not have felt the need to discuss them further. Nonetheless, the Commissioner's argument that Dr. Francisco's opinion did not conflict with those of Drs. Henson and Tin is unavailing.

### g. The ALJ's Errors Were Not Harmless; They Affected His Hypothetical Question to the Vocational Expert (VE)

Above, the Court has laid out errors in the ALJ's evaluation of Drs. Tin, Francisco, and Qasim's opinions; Plaintiff's work history; and Plaintiff's treatment. These errors are not harmless. The Seventh Circuit has held that analysis of harmless error is "prospective—can we say with great confidence what the ALJ would do on remand—rather than retrospective." *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). Here, the Court cannot say "with great confidence" that the ALJ would still rule against Plaintiff on remand.

For one, the hypothetical question that the ALJ asked the VE involved the condition that Plaintiff "can perform work that involves occasional interaction with the public." (Doc. 13-2, p. 62.) As discussed in Part I(b), this condition is inconsistent with Dr. Tin's opinion that Plaintiff should be limited to tasks that "do not require interaction with the general public." (Doc. 13-3, p. 31.) If the VE were presented with Dr. Tin's actual opinion, she may have reached a different conclusion about the existence of jobs that Plaintiff could perform.

The ALJ's decision to assign Dr. Francisco's opinion partial weight—based on erroneous considerations—is also significant. In response to the ALJ's questions, the

VE testified that Plaintiff could not "maintain employment without a special accommodation" if she were either "off task at least 15% of the workday" or had to miss work at least twice a month. (Doc. 13-2, p. 62-63.) If the ALJ were to fully credit Dr. Francisco's conclusion that Plaintiff had moderate-to-severe limitations as to concentration, persistence, and pace, he could reasonably conclude that Plaintiff would be off task at least 15% of the time or miss work at least twice a month. Such a conclusion would also be understandable given Dr. Qasim's findings of "significant impairment in social, occupational, and other important areas of functioning" and "often . . . feeling keyed up or on edge, difficulty concentrating, mind going blank, muscle tension, and social anxiety." (Doc. 13-8, p. 174.)

Indeed, the ALJ's RFC assessment and the hypothetical question posed to the VE must both incorporate all of the limitations that are supported by the record. *Yurt v. Colvin,* 758 F.3d 850, 857 (7th Cir. 2014). This is a well-established rule. *See Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (collecting cases). If the ALJ finds that a plaintiff has a moderate limitation in maintaining concentration, persistence, or pace, that limitation must be accounted for in the hypothetical question posed to the VE. *O'Connor-Spinner*, 627 F.3d at 620.

The Court has already determined that the ALJ's wording of the RFC was not *per se* unreasonable, inasmuch as it could plausibly describe some plaintiffs with moderate limitations in concentration, persistence, and pace. *See supra* p. 13. However, Parts I(a)-(f) illustrate how the ALJ's RFC and hypothetical question were formed based on erroneous and incomplete considerations. These shortcomings, in turn, manifested in the RFC and hypothetical question insufficiently accounting for

Plaintiff's difficulties interacting with others and concentrating for long durations.

Nor are the cases that the Commissioner cites for harmless error applicable here. In *Pavlicek v. Saul*, the Seventh Circuit considered an ALJ's alleged misstatement of doctors' opinions. 994 F.3d 777, 784 (7th Cir. 2021). Specifically, the ALJ stated that the individual could follow complex instructions as opposed to the doctors' recommended simple instructions. Because the ALJ asked a follow-up question about whether the VE's conclusions would change if Plaintiff were limited to simple instructions—and the VE said his restriction "was not work preclusive"— the Seventh Circuit ruled that "any error was harmless." *Id.* Here, the ALJ did not ask any similar follow-up questions. Indeed, in response to the two that he did ask— about an individual being off task for 15% of the workday or missing two days a month—the VE responded that no jobs would exist under those restrictions. (Doc. 13-2, p. 62-63.) Thus, *Pavlicek* is distinguishable.

*Jozefyk v. Berryhill* is a closer case. In *Jozefyk*, the Seventh Circuit found that "any error was harmless" because "[it was] unclear what kinds of work restrictions might address [claimant's] limitations in concentration, persistence, or pace because he hypothesizes none." 923 F.3d at 498. Here, however, Plaintiff has hypothesized limitations beyond what the ALJ concluded. Not only did Dr. Tin recommend no contact with the general public, but Plaintiff argued that she "lacked a capacity to maintain concentration for extended periods, regardless of task complexity, social modifications, or pace of production." (Doc. 13-3, p. 31; Doc. 15, p. 19.) This assertion was based on the findings of Drs. Henson and Tin, which the ALJ claimed to have given "significant weight." (Doc. 15, p. 19; Doc. 13-2, p. 26.)

Thus, based on the nature of the ALJ's errors and the relevant case law, the Court cannot determine with "great confidence" that the ALJ would have ruled in the same way. *McKinzey*, 641 F.3d at 892. Accordingly, the error here is not harmless.

## II.    Errors in the Vocational Expert's Job Incidence Numbers Require Remand

Plaintiff has also argued for remand because of inconsistencies between the VE's testimony and the Department of Labor job incidence numbers she said she relied on. Given that the Commissioner has not challenged the inconsistencies highlighted by Plaintiff, but rather responded to Plaintiff's arguments on procedural grounds, the Court finds it appropriate to assume that such a discrepancy does indeed exist. Thus, the question becomes whether the Court can consider this discrepancy, notwithstanding that Plaintiff's counsel did not cross-examine the VE at the hearing.

At Step Five, the Commissioner has the burden to demonstrate that "work exists in significant numbers in the national economy" that Plaintiff can perform. 20 C.F.R. § 404.1560(c)(2). "A VE's testimony can satisfy this burden only if that testimony is *reliable*. 'A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated.'" *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008) (quoting *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008)) (emphasis in original) (internal citations omitted). Here, Plaintiff alleged—and the Commissioner has not disputed—that the VE misquoted figures from the Department of Labor (DOL). Hence, the VE's testimony can be treated as "unreliable" and the ALJ's decision "must be vacated." *Overman*, 546 F.3d at 464 (quoting *Britton*, 521 F.3d at 803).

The Commissioner's main argument is that Plaintiff's failure to question the VE or file any post-hearing briefs is fatal. However, the cases the Commissioner cites to this effect are distinguishable. Contrary to the Commissioner's assertion, *Kolhaaas v. Berryhill* is not "on all fours" with this case. (Doc. 20, p. 4.) In *Kolhaas*, "Plaintiff's counsel did not ask the VE to identify the basis of the job numbers he testified to." 2018 WL 1090311, at *3 (S.D. Ill. 2018). Here, however, the VE did identify the source of her numbers; her testimony just inaccurately reported what her source actually said. *Barrett v. Barnhart* is similarly distinguishable from this case. 355 F.3d 1065, 1067 (7th Cir. 2004).

Meanwhile, *Coyier v. Saul* is inapplicable because it involved the plaintiff's failure to object to job-number estimates underlying a specific method and failure to file a supplemental brief that he promised to submit. 860 Fed. Appx. 426, 427-428 (7th Cir. 2021) (per curiam). Here, Plaintiff did not promise to file an additional brief, and the VE did not employ any particular method for the job incidence numbers. In fact, when the ALJ asked what her source for those numbers was, she only said "the Department of Labor, sir." She did not include any reference to her "professional experience and opinion," despite doing so when the ALJ asked about the jobs she identified. (Doc. 13-2, p. 63.)

Additionally, *Liskowitz* v. *Astrue* does not apply because the plaintiff there challenged the VE's reliance on the Occupational Employment Quarterly. 559 F.3d 736, 744 (7th Cir. 2009). Here, Plaintiff has not challenged whether the DOL can be cited, but rather that the VE did not accurately report data from the DOL. Similarly, *Ronnie L. v. Commissioner of Social Security* is distinguishable because Ronnie L.

challenged the "reliability of job numbers based on OccuBrowse data," as opposed to challenging the VE's recounting of OccuBrowse data. 2019 WL 652309, at *5 (S.D. Ill. 2019).

The above analysis of the cases that the Commissioner cited highlights the unique nature of this case. Here, Plaintiff is not challenging the method of the VE or differing interpretations of the Dictionary of Titles or the VE's failure to state a basis for his or her conclusions. Rather, Plaintiff is asserting that the VE did not accurately state what her own source said. Thus, the most applicable case is *Overman*, in which "[t]he Commissioner concedes on appeal that the VE's testimony conflicts with the DOT" and thus "the issue is whether that conflict necessitates remand." 546 F.3d at 462. The Seventh Circuit held that—even if the ALJ's reliance on the VE's testimony did not conflict with SSR 00-4p—the ALJ's ruling should still be vacated because it was "premised on the VE's 'flawed' testimony." *Id.* at 464. The same logic applies here.

## CONCLUSION

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g). The Clerk of Court is **DIRECTED** to enter judgment in favor of Plaintiff.

This Memorandum and Order should not be construed as an indication that the Court believes that Plaintiff was disabled during the relevant period, or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after

further proceedings.

**IT IS SO ORDERED.**

**DATED:  August 12, 2022**

<u>s/ *Stephen P. McGlynn*</u>
**STEPHEN P. McGLYNN**
**U.S. District Judge**